IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: ) | |
| ) | Chapter 13 |
| MARY L. VANTIGER-WITTE, ) | |
| ) | Bankruptcy No. 12-00239 |
| Debtor. ) | |

**RULING ON CONFIRMATION**

This contested Chapter 13 confirmation came before the Court for an evidentiary hearing. Derek Hong appeared for Debtor Mary Vantiger-Witte ("Debtor"). Marty McLaughlin appeared for Creditor United States of America on behalf of Farm Service Agency ("FSA"). The Court took the matter under advisement. The parties filed briefs. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

**STATEMENT OF THE CASE**

Debtor previously filed a Chapter 12 bankruptcy petition and later converted that case to Chapter 13. She sought confirmation of a Chapter 13 plan primarily to deal with her debt to FSA. In 2008, the Court found that Debtor had not filed her plan in good faith, denied confirmation, and dismissed the case.

Debtor filed this case in 2012. She originally filed it as a Chapter 7 and later voluntarily converted it to Chapter 13. Debtor now seeks confirmation of her Chapter 13 plan. FSA again objects to confirmation.

FSA argues that Debtor has not filed her petition or plan in good faith and argues that the Court has already addressed the issue in denying confirmation in Debtor's previous case. FSA argues that nothing has changed since 2008 to warrant a different result.

Debtor argues that this case is different because it was originally filed as a Chapter 7, not a Chapter 12. Debtor argues that the 2008 order found bad faith because she had filed a Chapter 12—which is for farmers who want to reorganize—even though she did not want to reorganize her farm. Debtor also argued and presented evidence that any impropriety that occurred on the FSA loan and collateral resulted from the actions of a third-party con-man, not Debtor. She argues that these differences warrant a different result in this case.

The Court finds that Debtor filed her petition and Chapter 13 plan in good faith, overrules FSA's objection, and will confirm the plan.

## BACKGROUND AND FINDINGS OF FACT

This is Debtor's second attempt to confirm a Chapter 13 plan. Her first Chapter 13 was dismissed in 2008 after this Court found that Debtor had not filed her plan in good faith, which is a requirement for confirmation under § 1325(a)(3). In re Vantiger-Witte, Bankr. No. 05-02931, 2008 WL 4493426 (Bankr. N.D. Iowa Sept. 29, 2008) (finding that Debtor did not show good faith because she did not

explain the depletion of collateral during her Chapter 12 case). Debtor now seeks confirmation of a Chapter 13 plan in this new case.

The same time period and general outline of events that were at issue in the 2008 order are at issue here: Debtor's FSA loan application in 2004, the failure of her farm operation, and the dissipation of FSA's collateral before and during Debtor's bankruptcy in 2005. Vantiger-Witte, 2008 WL 4493426, at *2–3 (setting out the Court's findings of fact). The Court will rely on the facts set out in that order but will also consider the new and additional evidence presented by Debtor in the current case.

Debtor's obligations to FSA arose out of a relationship with a man named Steve Heitshusen ("Heitshusen"). Heitshusen is a con man. Debtor was one of his victims. FSA should probably be considered his victim as well.

In 1999, Debtor met Heitshusen when she worked with him on his farm near Wayland, Iowa. Vantiger-Witte, 2008 WL 4493426, at *2. At some point their relationship became romantic. Heitshusen requested that Debtor get loans from FSA. Heitshusen told Debtor that he wanted her to get the loans so he could purchase back cows that had been repossessed. Heitshusen told Debtor that FSA would only give loans—or would be more likely to give loans—to her because she was a woman.

Debtor applied for supervised credit FSA loans. Under the supervised credit program, FSA carefully walks the borrower through the proper way to do business and how to service debt. Because FSA primarily provides loans to those who are unable to get traditional financing, supervised credit is meant to help borrowers succeed in new farming operations. Most of FSA's borrowers in that program would not qualify for conventional credit because of business and agricultural inexperience. In order to qualify, Debtor needed letters from three financial institutions denying financing. Heitshusen accompanied Debtor to all three financial institutions to get the denial letters.

In May 2004, Debtor became engaged to marry Heitshusen. The next month, Heitshusen accompanied Debtor to the FSA office to apply for farm loans. In fact, he coached her through the whole FSA loan process. FSA denied Debtor a loan because she had no knowledge, ability or experience related to running a farm. The loan officer noted that Debtor's lack of familiarity with farm terminology and total lack of experience or knowledge of farming undermined her application. Debtor did not tell FSA that Heitshusen would be helping on the farm. Debtor revised her application to downsize her request, but was denied again.

Debtor then appealed her denial and wrote letters to congressional representatives in an effort to secure financing from FSA. In September 2004, FSA decided in favor of Debtor on the appeal and provided financing. As a part of

the financing agreement, Debtor put up her house as security.  Debtor also indicated that she owned cows and pledged those cows as security.  In fact, however, Debtor only owned one bull.  She did not own cows.  The cows were actually Heitshusen's and had been repossessed.

Notably, Debtor was not the first woman that Heitshusen accompanied to an FSA office to try and get a farm loan.  Dawn Stewart, the FSA loan officer that Debtor worked with, had dealt with Heitshusen when he had brought in other women to get loans.  Those situations were similar.  The women he brought in had little to no experience farming.  They all owned homes.  Heitshusen convinced them to mortgage their homes to get FSA financing.

Like in the other situations, once Debtor secured financing, Heitshusen worked and managed the farm.  Debtor continued to work as a medical assistant during the day.  She worked on the farm at night and on the weekends.  Debtor did some farmhand work and entered financial information into the farm's accounting software.  Debtor testified that she wasn't really involved in the day to day operations of the farm.

Debtor truly believed that she was starting a life with Heitshusen.  Even though the loan was in her name only, and she signed the paperwork, she trusted Heitshusen to control and manage the farm.  He had coached her through it all and assured her it would all work out.

From the beginning, the farm operation had trouble. Ms. Stewart testified that, just a month into the farming operation, FSA had concerns about repayment.

When Debtor borrowed the money from FSA she believed the farm would be profitable and that she could repay the loan. Heitshusen had assured her he knew what he was doing. But the farm was never profitable. When Debtor realized that the farm was losing money, she thought about liquidating the operation like FSA suggested. Debtor did not liquidate, however, because Heitshusen told her not to.

Heitshusen, in fact, convinced Debtor to put more money into the farm. Debtor took money out of her retirement fund. Debtor also borrowed money from her parents. Debtor used this money to fund the farming operation. Despite this cash injection, the farm continued to fail.

As a part of the supervised credit program, Ms. Stewart visited Debtor's farm. During one of these visits, Ms. Stewart noticed that there was a sign on Debtor's truck (purchased with FSA money and subject to FSA's security interest) that said "Heitshusen Cattle Company." Ms. Stewart realized that Heitshusen was using the truck to conduct his own business. FSA had not loaned money to Heitshusen or Heithussen Cattle Company. In fact, he was ineligible for FSA loans. Ms. Stewart did not, however, take any action on that concern.

Ms. Stewart also testified that, during one of these visits she noticed that livestock was missing. Debtor had told Ms. Stewart that she was the person running the farm. Ms. Stewart did not believe Debtor. She knew Heitshusen was exerting influence over her. Ms. Stewart never described any action she took to address Heitshusen's role or her concerns related to him.

At some point after securing the loan, Debtor and Heitshusen's relationship broke down. Debtor testified that Heitshusen was controlling and manipulative. He often became angry and she eventually became afraid of him.

Debtor met with Ms. Stewart in October 2004. They discussed Heitshusen's anger, Debtor's other concerns, and her readiness to liquidate the farm. After this meeting, however, Heitshusen convinced Debtor to see how things would play out and Debtor did not liquidate the farm.

In November 2004, Heitshusen broke off their engagement. They continued to talk about the farm, however, because she was stuck with the farm financing.

In June 2005, Debtor filed a Chapter 12 bankruptcy petition. Debtor's Chapter 12 plan was to sell her house and then make regular payments on the debts—which were mostly to FSA. The plan was held up, however, because of a dispute about the priority of liens on the house. FSA believed it had the first lien on Debtor's home. That was contested, however, and after years of litigation, the Court ruled that the mortgage company had the first lien. During that litigation,

Heitshusen continued to operate the farm. Given that their relationship had deteriorated, Debtor was rarely on site. She did not live on the farm. She visited less and less as time went on. Heitshusen was the one doing almost all the work on the farm and controlled the farm.

The farm continued to lose money during the bankruptcy. Debtor and Heitshusen started selling animals to pay bills. Heitshusen was supposed to tell the cattle sale barn to send checks to the FSA office. Debtor testified that, at the time, she believed Heitshusen was doing this. Now, however, she believes that he either kept the cattle or sold the cattle and kept the proceeds.

Ms. Stewart reviewed Debtor's bankruptcy schedules after she filed her Chapter 12. Ms. Stewart was concerned because livestock was missing. Ms. Stewart could not account for the 2004–2007 calf crop. She also could not account for all the cows and bulls. She counted 150 head missing.

Ms. Stewart also noted that the crops were sold and the proceeds went to Heitshusen—not Debtor. Ms. Stewart knew this from "the criminal investigation." She did not specify what or who was being criminally investigated. She did not know of a criminal investigation of Heitshusen specifically, but offered no additional information.

Debtor sent monthly reports to FSA. These reports showed that the farm was never profitable. The entire time that she had the farm, Debtor never personally received money from the farming operation.

Debtor's Chapter 12 was eventually converted to Chapter 13. In 2008, the Court denied confirmation of her Chapter 13 plan. Vantiger-Witte, 2008 WL 4493426, at *6. When she converted to Chapter 13, all of the collateral securing the FSA debt—cattle, machinery, and crops—was either missing or had been sold without proceeds going to FSA. Id. The Court found that, based on the totality of the circumstances presented to the Court at that time, Debtor's plan was not filed in good faith. Id. The Court found that Debtor had unfairly manipulated the bankruptcy code "to rid herself of her farming operation by paying the least amount to her creditors." Id. The Court noted a key lack of evidence: "Debtor's inability to explain the depletion of FSA's collateral during the pendency of the Chapter 12 case is troublesome." Id. The Court found that the depletion of collateral "undermines the purpose of Chapter 12 to give farmers a chance at a fresh start while protecting creditors from further losses." Id. The Court denied confirmation and dismissed the case on that basis. Id.

At some point Debtor talked to Pam Taylor, who worked as a Special Agent for the Department of Agriculture. They talked about Heitshusen and the cattle on the farm. Ms. Taylor was investigating Heitshusen. Debtor learned for the first

time from Ms. Taylor that Heitshusen had a history of persuading women to get FSA loans and then putting them to work for his own use. Debtor also learned that there was a website detailing Heitshusen's actions. Debtor was shocked, disgusted, and ashamed that she had trusted him.

Based on this information, Debtor believes that Heitshusen conned other women the same way he conned her. Debtor has come to believe that Heitshusen never loved her. Debtor believes that Heitshusen simply used her—as a part of his con—to get FSA loans and convert the collateral to use in his own farm.

Debtor filed this case in 2012 as a Chapter 7. FSA filed an adversary case seeking to have its claim determined to be nondischargeable based on willful and malicious injury. Seeking to avoid prolonged litigation, Debtor converted to Chapter 13, where a Debtor may discharge a debt for willful and malicious injury under Chapter 13's "superdischarge." Debtor asserts that she committed no willful or malicious injury against FSA ever and was instead the innocent victim of a con. She claims she simply converted to Chapter 13 to avoid litigation in a Chapter 7 adversary.

Debtor is current on her plan payments. At the time of the hearing, Debtor had already made 44 of the plan's 60 monthly payments. Debtor testified that she is paying as much as she can into her Chapter 13 plan. Debtor testified that she

believes she will be able to complete her plan payments. The length of this case is due to settlement negotiations between Debtor and FSA.

## PARTIES' ARGUMENTS

FSA objects to confirmation on the basis that the 2008 order denying confirmation addressed the relevant facts and found that Debtor filed her plan in bad faith. FSA argues that the Court's determination in 2008 is based on the same set of facts as before the Court today: debtor borrowed money from FSA, ignored FSA's advice to liquidate, and failed to account for all calf crops, 55 head of cattle, and soybeans. Based on these facts, the Court found that Debtor had manipulated the Bankruptcy Code and denied confirmation. FSA argues that Debtor has provided nothing new to show that a different result is warranted in this case. FSA concludes that Debtor filed her petition and plan in bad faith.

Debtor argues that she did provide new and detailed evidence that shows she was duped by a con man and never acted in bad faith. She believes that she is as much of an innocent victim of Heitshusen's fraud as FSA. She argues she was forced to file bankruptcy because of Heitshusen's mismanagement and conversion of farm assets. She denies that she committed any willful or malicious injury against FSA. She argues that the Court's previous finding of bad faith was limited to the Chapter 12 involved there—and not the evidence she supplied (with the help of new counsel) here. The Court previously noted that Chapter 12 is for farmers

who intend to reorganize and that she did not intend to reorganize. Debtor argues that that finding does not apply here because she did not file under Chapter 12. She argues that she originally filed Chapter 7 and then converted to Chapter 13 to avoid litigation and make some payments to FSA. Debtor concludes that she filed both her petition and plan in good faith and that her plan meets the requirements for confirmation.

## CONCLUSIONS OF LAW AND ANALYSIS

The Bankruptcy Code sets out requirements that a Chapter 13 plan must meet to be confirmed. 11 U.S.C. § 1325 (2012). One of those requirements is that "the plan has been proposed in good faith and not by any means forbidden by law." Id. § 1325(a)(3). Another requirement is that "the action of the debtor in filing the petition was in good faith." Id. § 1325(a)(7). When a debtor has filed a petition in bad faith, a court may dismiss the case. Vantiger-Witte, 2008 WL 4493426, at *3 ("[Section] 1307(c) provides that the court may dismiss a case or convert it for cause, and numerous courts have held that filing a Chapter 13 petition in bad faith is cause."). Debtor has the burden to prove that a Chapter 13 plan meets the requirement for confirmation. Id.

> The term 'good faith' is not defined in the Bankruptcy Code and thus, the meaning has been the subject of extensive litigation. Since it is not defined, the inquiry is necessarily a fact intensive determination. Therefore, courts engage in a multi-faceted analysis that is applied on a case-by-case basis. Whether this balancing of equities is called

12

> moralistic, judging, or evaluating, it is exactly what the courts have been left with under the ambiguous requirement of good faith.

In re Goodvin, 548 B.R. 806, 811 (Bankr. N.D. Iowa 2016) (quoting Sullivan v. Solimini (In re Sullivan), 326 B.R. 204, 212 (1st Cir. BAP 2005)) (internal quotation marks omitted). In the Eighth Circuit, courts look to the totality of the circumstances to determine whether a plan has been filed in good faith. Vantiger-Witte, 2008 WL 4493426, at *3 (citing Eighth Circuit caselaw). In making this determination, "factors such as the type of debt sought to be discharged and whether the debt is nondischargeable in Chapter 7, and the debtor's motivation and sincerity in seeking Chapter 13 relief, are particularly relevant." Id. Although relevant, the fact that a claim may be nondischargeable in a Chapter 7—or has even been determined to be nondischargeable—"is not, standing alone, bad faith sufficient to sustain an objection to confirmation." In re Ault, 271 B.R. 617, 621 (Bankr. E.D. Ark. 2002) (collecting cases). "The key inquiry, however, is whether the plan represents an attempt to unfairly manipulate the Bankruptcy Code, which the Eighth Circuit has termed central to the court's task of determining whether the plan constitutes an abuse of the provisions, purpose or spirit of Chapter 13." Vantiger-Witte, 2008 WL 4493426, at *4 (internal quotation marks omitted).

A debtor's previous filings should be also be considered as a part of the totality of the circumstances analysis:

13

> A history of serial filings and dismissals can be evidence of bad faith. A debtor's pre-petition conduct and the frequency with which the debtor has sought previous bankruptcy relief are elements in the debtor's total circumstances. A non-exhaustive list of factors to consider when multiple filings are involved includes the following: (1) the length of time between the prior cases and the present one; (2) whether the successive cases were filed to obtain favorable treatment afforded by the automatic stay; (3) the effort made to comply with prior case plans; (4) the fact that Congress intended the debtor to achieve its goals in a single case; and (5) any other facts the court finds relevant relating to the debtor's purposes in making successive filings.

In re LeGree, 285 B.R. 615, 618–19 (Bankr. E.D. Pa. 2002) (citations and quotation marks omitted). Circumventing the appeal process by filing a second case instead of filing an appeal is a misuse of the bankruptcy process. In re Standfield, 152 B.R. 528, 535 (Bankr. N.D. Ill. 1993). "Each case must be examined in the totality of circumstances, yet the longer the period of time between the end of the prior case and the filing of the later case, the less burdensome is the debtor's task of showing entitlement to another opportunity for bankruptcy relief." In re Marett, No. 96-75003, 1996 WL 33340790, at *9 (Bankr. D.S.C. Nov. 13, 1996).

The Court will examine all the factors and the entire record—including the fact that this is Debtor's second attempt to confirm a Chapter 13 plan dealing with her FSA debt—in the totality of the circumstances analysis in this case. In particular, the Court will examine how this case differs from her previous case and how those differences change the good faith analysis.

14

This Court made the following findings in its analysis of Debtor's good faith in her previous bankruptcy: (1) Debtor accurately stated her assets, debts, and expenses and did not make any fraudulent representations to mislead the Court; (2) Debtor was unable to explain what happened to FSA's collateral; (3) Debtor did not file her Chapter 12 intending to reorganize her farming operation; (4) Debtor's plan would pay only 5.2% of FSA's claim. Vantiger-Witte, 2008 WL 4493426. After examining these factors, the Court concluded that Debtor had unfairly manipulated the Bankruptcy Code to "rid herself of her farm operation by paying the least amount to her creditors." Id. at *6. The Court will examine these factors—and also the fact that this is her second bankruptcy case that attempts to deal with the FSA loans—to determine whether Debtor is also unfairly manipulating the bankruptcy code in this case.

First, the Court finds that, like her previous bankruptcy, Debtor has not made any misrepresentations to mislead the Court. Debtor accurately stated her assets, debts, and expenses. This weighed in favor of finding good faith in Debtor's previous case. Likewise, it weighs in favor of finding good faith here.

Second, the Court finds that, unlike her previous bankruptcy, Debtor is now able to explain what happened to FSA's collateral. Debtor testified she discovered that, during her previous bankruptcy, Heitshusen conned her into taking out the FSA loans and converted FSA's collateral. This testimony is the basis for the

Court's new findings regarding Heitshusen's involvement in the farming operation and his conversion of the collateral. Those facts are set out above. Because Debtor explained what happened to FSA's collateral, this record is not the same as the record in 2008.

Importantly, Debtor's explanation does not conflict with the Court's 2008 order. In 2008, the Court found that the record was simply lacking in any information about what happened to the collateral. The Court found that the record lacked specific facts regarding the value of FSA's missing collateral and the willfulness or maliciousness of Debtor's conduct. The Court also found that Debtor was unable to explain what happened to the collateral. This lack of information was fatal to her attempt to show that she had filed her plan in good faith. In the concluding paragraph of that decision, the Court wrote

> Debtor's inability to explain the depletion of FSA's collateral during the pendency of the Chapter 12 case is troublesome. This undermines the purpose of Chapter 12 to give farmers a chance at a fresh start while protecting creditors from further losses. The Court is convinced that Debtor has unfairly manipulated the Bankruptcy Code.

Vantiger-Witte, 2008 WL 4493426, at *6. This led the Court to conclude that "Debtor's plan violates § 1325(a)(3)." Id. Because Debtor has now explained what happened to the collateral, this case is fundamentally different and a different result is warranted.

16

Debtor realized she had been conned after talking with an investigator. Before this conversation, Debtor did not know what happened to the collateral and so could not explain why it was gone. She is now able to explain what happened. The Court has found her explanation persuasive.

Third, the Court finds that, unlike her previous bankruptcy, Debtor's lack of intent to reorganize her farm is irrelevant. In finding that Debtor had filed her plan in bad faith, the Court noted that it was "difficult . . . to find that Debtor filed her Chapter 12 with the good faith intent to reorganize her farm and pay her creditors." Id. at *6. Debtor originally filed this case as a Chapter 7, not a Chapter 12. Because Debtor did not file a Chapter 12, this Court's earlier analysis does not apply.

Fourth, the Court finds that, like her previous bankruptcy, Debtor's plan payments to FSA are minimal. Nevertheless, Debtor testified that she was paying as much as she could to FSA through her plan. This testimony was undisputed. FSA presented no evidence about additional funds that could be paid into the plan. As a result, although the plan payments are a fraction of FSA's total claim, this fact mitigates the weight of this factor.

Fifth, although the fact that this is Debtor's second attempt to confirm a plan evidences bad faith, there are mitigating factors here as well. The length of time between the cases is a mitigating factor. In re Marett, No. 96-75003, 1996 WL

17

33340790, at *9 (Bankr. D.S.C. Nov. 13, 1996).  Also, a "bona fide change in circumstances" justifies a second or successive filing.  In re Roeben, 294 B.R. 840, 845 (Bankr. E.D. Ark. 2003).

Here, there was a substantial period of time—about four years—between Debtor's cases.  Moreover, during that time, Debtor learned what happened to FSA's collateral and came to understand what had happened to her farm.  She learned that Heitshusen had influenced her into taking out the loans and letting him manage the farming operation for his own fraudulent purposes.  This is a bona fide change in circumstances that justifies this second filing.  This change in circumstances is not tactical or subject to her control: it was the result of talking with others and piecing together what happened with Heitshusen and her farm during her previous bankruptcy.  As a result, the fact that this is Debtor's second filing is mitigated substantially by the amount of time that has passed as well as the bona fide change in Debtor's circumstances.

Finally, the Court finds that Debtor is motivated and sincere in seeking Chapter 13 relief.  She has stayed current with her plan payments and is paying as much as she can into her Chapter 13 plan.  Nothing indicates that this case represents an attempt to unfairly manipulate the Bankruptcy Code.  Debtor was the victim of a con artist.  Discharging the debts that resulted from her relationship with Heitshusen is not an abuse of the provisions, purpose, or spirit of Chapter 13.

The record in this case is different and more complete than the record in Debtor's previous bankruptcy. As a result, this case warrants a different result than Debtor's previous bankruptcy. Based on the totality of the circumstances, the Court concludes that Debtor filed her plan and petition in good faith and that her plan meets the requirements of § 1325.

## CONCLUSION

**WHEREFORE**, the United States' objection to confirmation is OVERRULED.

**FURTHER**, Trustee shall submit a proposed order for the Court's consideration confirming this plan.

Dated and Entered: September 12, 2016

_____
THAD J. COLLINS
CHIEF BANKRUPTCY JUDGE